UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| VALERIE CAMDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:16 CV 1694 (JMB) |
| | ) | |
| NANCY A. BERRYHILL,[1] Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

In April 2013, plaintiff Valerie Camden filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*. (Tr. 200-01), with an alleged onset date of January 10, 2013. In May 2014, she filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of March 1, 2011.[2] (Tr. 236-41). After plaintiff's application for Title II benefits was denied on initial consideration (Tr. 115-19), she requested a hearing from an Administrative Law Judge (ALJ).[3] (Tr. 122-23, 124-25).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

[2] Plaintiff subsequently amended the alleged onset date for both applications to April 5, 2013. (Tr. 77).

[3] The record does not reflect that plaintiff's supplemental security application received an initial determination; nonetheless, the ALJ and Appeals Council addressed the claim and the Court finds that it has jurisdiction over this claim. See Weinberger v. Salfi, 422 U.S. 749, 767 (1975) (interpreting failure of

Plaintiff and counsel appeared for a hearing on December 18, 2014. (Tr. 74-100). At plaintiff's request, the ALJ held the record open and conducted a supplemental hearing on July 17, 2015. (Tr. 21, 37-72). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from medical expert Janet Telford-Tyler, Ph.D., and vocational expert Delores Gonzalez, M.Ed. The ALJ issued a decision denying plaintiff's applications on September 4, 2015. (Tr. 18-36). The Appeals Council denied plaintiff's request for review on September 1, 2016. (Tr. 1-7). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff was born on June 16, 1970, and was 42 on the alleged onset date. She completed the tenth grade. She did not obtain a GED but did receive vocational training as a medical assistant. (Tr. 81). She previously worked as an administrative assistant, a waitress, a receptionist, and a truck dispatcher. (Tr. 82-88). As a truck dispatcher, plaintiff supervised, hired and fired drivers, made their schedules, and ensured they met annual licensing and drug testing requirements. (Tr. 58, 257). In September 2014, she worked as a cashier at a gas station for one month; the owner complained that she had erratic behavior because she would start to cry and leave her register. In 2015, she worked as a cashier for 15 to 20 hours a week for about two months, but she was unable to continue due to panic attacks and crying spells. (Tr. 52-53).

---

Secretary to challenge exhaustion to be a determination that decision is "final" for purposes 42 U.S.C. § 405(g)). In addition, plaintiff apparently filed an application for supplemental security income on July 15, 2013. (Tr. 141). That application does not appear in the administrative record.

Plaintiff next worked as a "perma sealer" in a plastics factory and continued to experience panic attacks.[4]  (Tr. 54-57, 60, 221-22).

Plaintiff listed her impairments as depression, anxiety, panic attack, and tremors.  She stopped working due to her short-term memory, anxiety, panic attacks, and manic depression.[5]  (Tr. 278).  She testified that she was unable to work due to her depression, crying, and self-isolation.  (Tr. 89).  Between January 2013 and June 2015 — the time period encompassed by the ALJ's decision — plaintiff was prescribed a number of medications for the treatment of anxiety, depression, and insomnia, and to reduce cravings for alcohol or substances.  She took levothyroxine and Zantac for medical conditions.  (Tr. 89-90, 254, 281, 287-94, 329-33).

Plaintiff stated in her May 2013 function report (Tr. 230-38) that she attended group therapy at Community Treatment, Inc., (Comtrea) three afternoons a week and AA meetings "6-8 nights a week."  Her husband and daughter prepared dinner.  She stated that she had "lost" her short-term memory and needed help remembering to take her medication.  She was not able to prepare meals or complete chores without help due to her distraction and poor memory.  Her medications caused shaking and blurred vision which, in combination with her poor memory, prevented her from driving.  She was unable to pay bills, count change, or handle bank accounts.  Plaintiff had difficulties with talking, seeing, memory, completing tasks, concentrating, understanding, following instructions, and using her hands.  The Field Office interviewer noted

---

[4] Plaintiff told treatment providers about other employment that she did not include in her function report. For example, in October 2013 and June 2014, she worked in a cleaning business owned by family members.  (Tr. 815-16; 838).  She also drove a school bus between March and June 2014, a job she reported that she enjoyed.  (Tr. 864-65; 860-61; 847-48).  In July 2014, she reported that she was working part-time.  (Tr. 833).

[5] As is discussed more thoroughly below, plaintiff also had an extensive history of dependence on or abuse of alcohol, cocaine, methamphetamine, and Xanax.

that plaintiff's short-term memory seemed poor, and that she appeared confused and had difficulty answering questions. (Tr. 242-43).

Plaintiff testified at the December 2014 hearing that she and her 16-year old daughter lived with her parents. (Tr. 91). On good days, she was able to do her laundry and handle some household chores. She used to golf and hunt, but no longer had any interest in doing so. She did not spend time on a computer and generally did not go anywhere other than to medical appointments. (Tr. 92-93). Her recent attempt to work as a cashier failed because she had crying spells and panic attacks when the store got crowded. (Tr. 94). From 2011 to 2013, she was dependent on alcohol and illegal drugs. She had been clean since April 5, 2013, when she admitted herself to Center Pointe Hospital. (Tr. 95). After her release, she received psychiatric treatment from Dr. Rohatgi at Comtrea until July 2014, when she asked her primary care physician, Dr. Kenneth Ross, M.D., to take over her medications.[6] (Tr. 96-97). Despite ceasing all substance use, she experienced four or five "bad days" a week due to her psychiatric symptoms and she and Dr. Ross were going to discuss electric shock treatment at her next appointment. (Tr. 98). At the July 17, 2015 hearing (Tr. 37-72), there was testimony that plaintiff was hospitalized in February 2015 following an overdose of Xanax and alcohol. (Tr. 43-44). A few days before the hearing, she had an episode of crying and shaking at work and was sent home. She contemplated admitting herself for inpatient care, but did not want to miss the hearing. (Tr. 56-57).

At the 2015 hearing, Dr. Telford-Tyler offered her opinion about the limitations on plaintiff's mental ability to perform work-related functions, based on interrogatories and a

---

[6] Plaintiff testified that Dr. Rohatgi's treatment often made her symptoms worse. (Tr. 95-96). On October 14, 2014, Dr. Ross noted that Dr. Rohatgi "fired" plaintiff in August 2014. (Tr. 877).

medical source statement she completed in February 2015 (see Tr. 890-98) and plaintiff's more recent medical treatment. (Tr. 41-50). Dr. Telford-Tyler found that plaintiff's medically determinable impairments were major depressive disorder (Listing 12.04) and alcohol and cocaine dependence (Listing 12.09). Her opinion is discussed in greater detail below but, in summary, Dr. Telford-Tyler opined that plaintiff would have moderate difficulties in maintaining concentration, persistence, and pace, but was able to understand and complete simple and detailed work, with some occasional problems with more complex tasks. She was likely to miss work one or two times a month.

Vocational expert Delores E. Gonzalez was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform work at all exertional levels but who was limited to understanding, remembering, and carrying out simple instructions. (Tr. 67). In addition, the hypothetical individual was limited to only occasional interaction with the public, coworkers, and supervisors, and could tolerate only occasional changes in work location, and could make only simple work-related decisions. According to Ms. Gonzalez, such an individual would be able to perform plaintiff's past work as a sealer. In addition, the individual could perform other work that was available in the regional and national economy, including cleaner, lab equipment cleaner, and marker. (Tr. 67-68). An individual who was absent from work, late for work or needed to leave work early one to two times a week would be unable to perform any work in the national economy. (Tr. 68). For a person working at the unskilled level, absences of more than one day a month would preclude employment. (Tr. 69-70).

**B.** **Medical Evidence**

The administrative record in this case includes records of plaintiff's medical care beginning in May 2010. Plaintiff confines her discussion of the medical evidence to the treatment she received beginning in March 2013. The Court briefly summarizes the earlier records.

1. Treatment records: 2010 through 2012

Between May 2010 and September 2012, plaintiff was treated at St. Anthony's Medical Center on seven occasions after an overdose of medication or other suicidal gesture made while intoxicated. (Tr. 369, 388, 401, 417, 442, 457, 455-56). In February 2012, plaintiff had an initial assessment at Comtrea, at the urging of a DFS caseworker. (Tr. 617). Plaintiff reported that she wanted inpatient treatment for alcohol and cocaine use, and it appears that she entered the program at Southeast Missouri Behavioral Health. (Tr. 534); (see also Tr. 442) (noting that plaintiff was allowed to sign out from St. Anthony's Hyland Center against medical advice to enter treatment program). In June 2012, plaintiff reported to psychiatrist Gautam Rohatgi, D.O., at Comtrea that she had been off all medication and sober for two months and was attending AA meetings. (Tr. 530-31). She was diagnosed with major depressive disorder, recurrent; generalized anxiety disorder; cocaine dependence in early sustained remission; and alcohol dependence in early sustained remission. Dr. Rohatgi prescribed the antidepressant amoxapine, and antipsychotic Haldol. Although plaintiff reported improvement in her symptoms on July 28, 2012, she was treated in the emergency department on July 29, 2012, and again on September 3, 2012, after being found unresponsive as a result of mixing alcohol and medication. (Tr. 528, 455, 457). In October 2012, plaintiff reported that she had been drinking and requested a support group. (Tr. 579). She was referred to Comtrea's substance treatment program and, in November

2012, began attending education and support groups and receiving services from a community support specialist and a substance abuse counselor. (Tr. 581, 574-75, 576-77, 558-59).

### 2. Treatment records: 2013 through 2015

In February 2013, plaintiff reported to substance abuse counselor Peter Ninneman, M.S.W., that "everything is good." She was looking for a job and had gone to court and reported to her community service assignment. She reported some side effects of medication. (Tr. 556). Plaintiff resumed medication review with Dr. Rohatgi in January 2013. (Tr. 524-25). On March 1, 2013, Dr. Rohatgi noted that plaintiff was sad and depressed and was sleeping too much. She had multiple psychosocial stressors. On examination, plaintiff was quite guarded and quiet, with fair-to-poor eye contact. She had minimal spontaneous speech. Her insight and judgment were fair to poor. She was diagnosed with major depressive disorder, recurrent, mild to moderate; generalized anxiety disorder; and cocaine dependence and alcohol dependence in early sustained remission. Dr. Rohatgi made changes to plaintiff's antidepressant medications. On March 7, 2013, plaintiff told Mr. Ninneman that her mood had improved with the medication changes and that she wanted to taper off Xanax. She admitted to drinking small quantities of alcohol. (Tr. 547-48). On March 30, 2013, plaintiff was taken to St. Anthony's Medical Center in police custody after an overdose of alcohol and Xanax, which she denied was a suicide attempt. (Tr. 479-80, 482-84, 520). She was variously described as combative, agitated, and labile, and ultimately required physical and chemical restraint. Once sober, she was anxious and worried but not suicidal. She was discharged to continue in outpatient treatment. (Tr. 485). On April 1, 2013, plaintiff told Dr. Rohatgi that she had difficulty controlling the urge to drink. (Tr. 520-21). She denied feeling depressed and, on examination was cooperative, with good eye contact, linear thought processes, and frustrated mood. Her insight and judgment were poor. Dr. Rohatgi

directed plaintiff to speak with her primary care physician about discontinuing Xanax and starting gabapentin. He prescribed ReVia.[7] On April 2, 2013, plaintiff told Mr. Ninneman that she was having difficulty handling stress. She was unhappy with the total abstinence requirement and reported that her husband was abusive and enabled her continued drinking. (Tr. 544-45). Mr. Ninneman gave plaintiff referrals for medical detoxification programs at her request.

Plaintiff was admitted to Center Pointe Hospital's inpatient chemical dependency unit on April 5, 2013. (Tr. 502-06). She reported that she had been drinking a fifth of vodka a day for about three months and using methamphetamine periodically. A physical examination was unremarkable, with the exception of elevated thyroid stimulating hormone levels. She was started on Synthroid. (Tr. 507-09). At discharge on April 19th, it was noted that plaintiff actively participated in all phases of the rehabilitation program. (Tr. 501). She was described as making good progress and motivated to continue a recovery program. She wished to move with her teenaged daughter to her parents' home. At discharge, her diagnoses were polysubstance dependence, rule out bipolar disorder NOS; alcohol dependence; and hypothyroidism. Her discharge medications included Cogentin to address extrapyramidal symptoms, Tegretol as a mood stabilizer, trazadone for insomnia, Vistaril for anxiety, Neurontin, Prilosec, and Synthroid. She was directed, pursuant to a court order, to follow-up with Comtrea. (Tr. 501-02).

Plaintiff attended regular group meetings at Comtrea. (Tr. 780-89). She met with Dr. Rohatgi for medication management every three or four weeks. In May 2013, she reported that she had detoxed from Xanax while at Center Pointe. (Tr. 796-97). She denied any depression or

---

[7] ReVia, or naltrexone, is an opioid antagonist that works by decreasing cravings. See https://medlineplus.gov/druginfo/meds/a685041.html (last visited on Nov. 1, 2017).

loss of interest, but was uncomfortable due to medication side effects, including sedation, tiredness, confusion, and fatigue. On examination, she was cooperative, with good eye contact, linear thought processes, and fluent, clear speech. Her affect was "worried due to the side effects of these medications." Her insight and judgment were fair. Dr. Rohatgi made changes to plaintiff's medication and directed her to contact the clinic if she noticed any deterioration in her mood or behavior. In June 2013, the side effects had dissipated, but she complained of mood swings, frustration, anger, anxiety, and difficulty with short-term memory. She reported that her medications were effective in curbing her desire for alcohol and drugs. On examination, she was cooperative and had good eye contact, linear thought processes, and fluent, clear speech. Her mood was tired and anxious, and her affect was worried. Her insight and judgment were fair. Her diagnoses were major depressive disorder, recurrent; generalized anxiety disorder; and alcohol dependence and cocaine dependence in sustained early remission. Dr. Rohatgi again made medication changes. (Tr. 825-26). In July 2013, plaintiff reported that the mood swings, anger, and irritability had abated and she was maintaining sobriety. Dr. Rohatgi determined that her depression was in full remission and made no changes to her medication. (Tr. 823-24).

Beginning in August 2013, plaintiff experienced multiple stressors: her husband was drinking heavily, her daughter was assaulted by a neighbor, and she and her daughter moved into her parents' home. She used alcohol at least once in August. (Tr. 783). On August 29, 2013, she told Dr. Rohatgi that she had been without medication for two weeks. He declined her request for Valium and Xanax, explaining that they were not in her best interest, and restarted her medications. On examination, she was cooperative, with good eye contact and linear thought processes, and fluid, clear speech. Her affect was angry, upset, and sad. Her insight and judgment were fair. (Tr. 819-20). In September 2013, Dr. Rohatgi noted that plaintiff improved

once she resumed her medications. (Tr. 821-22). She reported that her anxiety had decreased by 20-30%, but her sleep was disturbed. She continued to experience a number of stressors but was coping as best as could be expected and meeting her responsibilities, despite feeling sad, angry, and frustrated over recent events. She denied all alcohol and drug use. On examination, her affect was calm and appropriate, her mood was frustrated and upset, and her insight and judgment were fair. Dr. Rohatgi made some alterations to her medications and set a follow-up appointment in two weeks.

On October 4, 2013, plaintiff reported that she was having difficulty sleeping and so had changed her gabapentin dosage and was taking Nyquil. (Tr. 817-18). In addition, she had taken Valium, which was detected in a drug screen administered to her after a car accident. She stated that she was not having mood swings or irritability, but continued to feel sad, angry, and frustrated. She was performing her activities of daily living. Dr. Rohatgi prescribed doxepin for insomnia. On October 31st, plaintiff reported that she still experienced disturbed sleep. (Tr. 815-16). She was otherwise doing well in that her agitation and irritability had decreased and her mood was more calm and relaxed. She did not experience mood swings, mania, depression, loss of interest, or cravings for alcohol or drugs. She was planning to start working in a relative's cleaning business. Dr. Rohatgi diagnosed her with major depressive disorder, recurrent, improved; generalized anxiety disorder; and alcohol dependence and cocaine dependence in sustained early remission.

Plaintiff's engagement with services at Comtrea dropped off between November 2013 and January 2014, and she faced dismissal from the program. (Tr. 766-80). During a phone call in December, she told Mr. Ninneman that she was moving and had enough medication to last until January. He agreed to send her referrals for treatment providers in her new area. (Tr. 775).

In late January 2014, plaintiff called Mr. Ninneman and reported that she was still living with her parents and was home schooling her daughter. She agreed to make an appointment at Comtrea. (Tr. 766).

On February 4, 2014, plaintiff told Dr. Rohatgi that she was doing well and coping appropriately with various stressors, although she had trouble sleeping. (Tr. 813-16). He made some changes to her medication. He described her as quite guarded and diagnosed her with major depressive disorder, recurrent, in full remission; generalized anxiety disorder; and alcohol dependence and cocaine dependence in sustained early remission. On February 28, 2014, plaintiff reported that she was still struggling with depression, and rated her anxiety level at 10 on a 10-point scale. She continued to struggle with sleep and stated that she had racing thoughts. She was helping her mother take care of her father, who was now disabled. She was informed that she needed to remain alcohol free and have consistent attendance in order to graduate from the substance abuse program. (Tr. 875-76). On March 24, 2014, plaintiff told Mr. Ninneman that she was working and had gotten a car. (Tr. 864-65). She reported that there were days when she did not want to get out of bed and she had used alcohol on two occasions. Her goal was to drink in moderation, rather than "shoot for abstinence." She understood that abstinence was required to complete the program, however, and stated that she would avoid "happy hour for ten weeks." In April 2014, she reported that she was working and had a better relationship with her daughter. She said she was maintaining sobriety, even though she was tempted to drink. (Tr. 860-61). She had stopped taking her thorazine "to see if it would make a difference," because going off her medications was "the only thing that gives excitement to my life." (Tr. 861). She agreed not to make any more medication changes without consulting with Dr. Rohatgi first. Plaintiff's urine screens came back positive for alcohol and benzodiazepines on April 17, and

May 6, 2014. (Tr. 862, 855). She admitted to taking two sips of wine and taking a prescription cough medicine, but denied taking benzodiazepines. She worried about the impact of the positive test on her probation status. (Tr. 856).

On June 10, 2014, plaintiff reported to Mr. Ninneman that she was attending AA, staying sober, and enjoying work as a school bus driver. (Tr. 847-48). She was finding it much easier to stay sober "because she is doing the kind of work she wants to." Unfortunately, her job was terminated a few days later based on her past drug offense. (Tr. 841). By late June, she was working in the family cleaning business again. (Tr. 838). Dr. Rohatgi noted that plaintiff's mood was euthymic as long as she was taking Cymbalta and Haldol. (Tr. 809-10). She agreed to accept a referral to a sleep specialist to address her continuing insomnia. Plaintiff's diagnoses were major depressive disorder, recurrent, in full remission; generalized anxiety disorder; and alcohol dependence and cocaine dependence in sustained early remission. In July 2014, she was preparing for discharge from Comtrea. (Tr. 834-35). She had spoken with the pastor of her church about forming a support group. On August 6, 2014, she successfully completed the alcohol and drug abuse program. (Tr. 827-29). She planned to continue to see Dr. Rohatgi and utilize case management services. Her medications at discharge were Haldol, Cymbalta, and levothyroxine. The medical record does not contain any further notes from Dr. Rohatgi after this date.

There are no records of further medical care until February 3, 2015, when plaintiff was transported to St. Anthony's Medical Center by ambulance after taking 20 Xanax while drinking heavily. (Tr. 899-926). She was admitted to the intensive care unit and then transferred to the Hyland Behavioral Health unit. (Tr. 899). Her primary care physician, Kenneth Ross, M.D., noted that plaintiff reported that she was under a great deal of stress and was distraught because

her mother was in hospice care. (Tr. 905-06). The consulting psychiatrist recommended electroconvulsive treatment, but plaintiff refused. (Tr. 905, 899). She was discharged in order to attend to her mother. (Tr. 916). Dr. Ross saw plaintiff on February 15, 2015, and made unspecified changes to her medications. Plaintiff was "refusing psychiatry" at that time. (Tr. 899).

Plaintiff began treatment with psychiatrist Ashok Yanamadala, M.D., on February 26, 2015. (Tr. 937-39). She reported that her mother had died recently. Plaintiff was working part-time at a grocery store and attending AA meetings. On examination, plaintiff was well-groomed and cooperative, with an anxious, dysthymic mood, with feelings of helplessness and hopelessness. She was not suicidal and had no hallucinations. She displayed normal psychomotor activity, intact recent and remote memory, intact attention/concentration, intact executive functioning, normal reasoning, logical thought content, and normal cognition. Dr. Yanamadala diagnosed plaintiff with bipolar I disorder, most recent episode depressed, severe without psychotic features. He prescribed Zolpidem,[8] Latuda,[9] and alprazolam, the generic form of Xanax. On March 19, 2015, plaintiff complained of drowsiness caused by Latuda. (Tr. 935-36). She reported having problems with inattention, distractibility, and depressed mood. However, on examination, plaintiff's mood was normal and her memory, concentration, and attention were all intact. Dr. Yanamadala directed plaintiff to take Latuda at night to address the daytime sleepiness, discontinued the Zolpidem, and added Adderall. In April 2015, plaintiff reported that her depression was worsening and she was feeling panic and anxiety when around

---

[8] Zolpidem is a sedative used to treat insomnia. https://medlineplus.gov/druginfo/meds/a693025.html (last visited on Nov. 3, 2017).

[9] Latuda is an atypical antipsychotic used, *inter alia*, to treat depression in people with bipolar disorder. https://medlineplus.gov/druginfo/meds/a611016.html (last visited on Nov. 3, 2017).

other people. (Tr. 933-34). Her mental status examination disclosed an anxious mood, but good grooming, cooperative attitude, appropriate affect, and intact memory, concentration, and attention. Dr. Yanamadala made changes to the dosages of her medications. On May 19, 2015, a mental status examination revealed an anxious, low, dysthymic mood, but an otherwise normal mental status. (Tr. 931-32). No changes were documented on June 19, 2015. (Tr. 929-30).

### 3. Opinion Evidence

On June 10, 2013, State agency consultant Aine Kresheck, Ph.D., completed Psychiatric Review Technique forms based on a review of the record. (Tr. 104-05, 106-09). Dr. Kresheck concluded that plaintiff had medically determinable impairments in the following categories: 12.09 (substance addiction disorders); 12.04 (affective disorders); 12.06 (anxiety-related disorders); and 12.08 (personality disorders). Dr. Kresheck opined that these impairments could reasonably be expected to cause some of plaintiff's alleged symptoms, but that plaintiff's statements regarding the severity of her symptoms were only partially credible and were not substantiated by the objective medical evidence alone. Dr. Kresheck further opined that plaintiff alleged a greater degree of mental impairment in her activities of daily living than was supported by the medical evidence and that plaintiff's impairment worsened when she engaged in substance abuse. (Tr. 106). In a mental residual functional capacity (MRFC) assessment (Tr. 106-08), Dr. Kresheck opined that that plaintiff was moderately limited in the abilities to understand, remember and carry out detailed instructions. She was moderately limited in some components of attention, concentration, persistence, and pace; similarly, she was moderately limited in some components of interacting with others in a work setting and adapting to changes. Otherwise, she had no significant limitation in her abilities to perform sustained work activities, and, when she abstained from drug and alcohol use, was able to complete simple and repetitive

14

tasks with limited social contact. (Tr. 108). The ALJ gave some weight to Dr. Kresheck's opinion. (Tr. 27).

On October 14, 2014, Dr. Ross completed a form letter stating that plaintiff was "totally disabled without consideration of any past or present drug and/or alcohol use" because she was not then using drugs or alcohol and "remains disabled." (Tr. 622). There are no records of any treatment Dr. Ross provided to plaintiff between March 2012 (Tr. 352) and the date of this opinion letter.

On February 7, 2015, medical expert Janet Telford-Tyler provided responses to medical interrogatories and completed a medical source statement. (Tr. 890-98). She opined that plaintiff had a "basic pattern of . . . abusing alcohol and cocaine which usually results in a hospitalization in which she quickly clears and her mental status at discharge is unremarkable." (Tr. 890). Dr. Telford-Tyler opined that "[w]hen she is not abusing substances and is compliant with treatment, [plaintiff] is capable of ADLs, appropriate social interactions and would have no problems with concentration/persistence and pace." Id. In support, Dr. Telford-Tyler cited the evidence that plaintiff was home-schooling her daughter in January 2014, got a car in February 2014, and worked as a bus driver between March and June 2014. Dr. Telford-Tyler rejected Dr. Ross's October 2014 opinion that plaintiff was disabled as inconsistent with his treatment notes and unsupported by any explanation. (Tr. 891). Dr. Telford-Tyler found that plaintiff was capable of independent ADLs, had the ability to relate appropriately, and had no cognitive limitations. Plaintiff's complaints of confusion, impaired memory, and inability to understand were given no weight as unsupported by any records in the file. These issues would occur only when she was under the influence of alcohol or drugs and, by her own reports, she had been sober since May 2014. Id. Based on these findings, Dr. Telford-Tyler opined that plaintiff had

the ability to understand, remember, and carry out simple and detailed instructions and to follow work procedures, but might have difficulty with more complex instructions.  She had the ability to maintain attention and perform at an acceptable pace for two-hour periods for an eight-hour day and 40-hour work week, with normal breaks and without interruption from psychologically-based symptoms.  She would be able to do so under normal supervision and would be able to maintain regular attendance and punctuality.  She was able to relate appropriately on a casual basis with the public, accept direction and criticism from supervisors, and relate appropriately to coworkers.  She was also able to questions and make requests for help.  Finally, she had the ability to adapt to routine changes in the work setting, set realistic goals, and make plans independently of others.  (Tr. 894).

On June 29, 2015, treating psychiatrist Dr. Yanamadala completed a mental impairment questionnaire.  (Tr. 942-45).  He listed plaintiff's diagnosis as Bipolar I disorder, most recent episode depressed, severe without psychotic features.  Her medications included Adderal, alprazolam, Latuda, ranitidine, and levothyroxine.  On a checklist of signs and symptoms displayed by plaintiff, Dr. Yanamadala endorsed a number of abnormalities of mood, including depressed mood, and persistent or generalized anxiety, constricted or irritable affect, and feelings of guilt or worthlessness.  In addition, plaintiff had difficulty thinking and concentrating, was easily distracted, had flight of ideas, and had poor remote memory.  She had recurrent panic attacks, appetite disturbance, decreased energy, and excessive sleep.  (Tr. 942).  Anxiety flares caused severe stomach pains and being around others worsened her depression.  (Tr. 943).  Dr. Yanamadala opined that plaintiff was moderately or markedly limited in every mental activity required for sustained work in a competitive environment.  (Tr. 944).  As a result of her

impairments, she was likely to be absent from work more than three times a month. (Tr. 945). The ALJ gave no weight to Dr. Yanamadala's opinion.[10] (Tr. 28).

At the hearing in July 2015, Dr. Telford-Tyler updated her opinion after reviewing Dr. Yanamadala's treatment records and medical source statement. (Tr. 42). Dr. Telford-Tyler stated that plaintiff's medically determinable impairments remained unchanged but, based on Dr. Yanamadala's observations that plaintiff demonstrated inattention and distractibility, Dr. Telford-Tyler modified her original opinion to conclude that plaintiff would have moderate difficulties in maintaining concentration, persistence, and pace. She still would be able to understand and complete simple and detailed work with some occasional problems with more complex tasks. (Tr. 43, 46). Dr. Telford-Tyler rejected Dr. Yanamadala's opinion that plaintiff had marked impairments as unsupported by his treatment notes. (Tr. 44-45). The ALJ gave great weight to Dr. Telford-Tyler's opinion. (Tr. 28).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his

---

[10] The record contains additional reports completed by Dr. Yanamadala in March and August 2016. (Tr. 946-50; 8). The Appeals Council determined that, because the ALJ decided plaintiff's case through September 4, 2015, Dr. Yanamadala's 2016 opinions had no bearing on whether plaintiff was disabled on or before that date. (Tr. 2). Plaintiff does not challenge this decision.

physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse,

even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. **The ALJ's Decision**

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff had not engaged in substantial gainful activity since January 10, 2013, the alleged date of onset.[11] (Tr. 23). At steps two and three, the ALJ found that plaintiff had severe impairments of bipolar disorder and depression and that none of her impairments or combination of impairments met or was medically equivalent to a listed impairment.[12] Id. at 24.

The ALJ next determined that plaintiff had the RFC to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can only understand, remember, and carry out simple instructions. The claimant can only have occasional interaction with supervisors, co-workers, and the public. The claimant can only tolerate occasional change in work location. The claimant can only make simple, work-related decisions.

(Tr. 26).

In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's own statements regarding her abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's

---

[11] The ALJ's analysis of the evidence for the purposes of plaintiff's Title II application focused on the period beginning January 10, 2013, through December 31, 2014, her date last insured. The relevant period for plaintiff's Title XVI application was May 4, 2014 — the date she applied for supplemental security benefits — through the date of the decision. (Tr. 21).

[12] The ALJ analyzed plaintiff's eligibility for Listing 12.04 (depressive, bipolar and related disorders) and the "paragraph B" criteria. Id. For the purposes of considering the paragraph B criteria, the ALJ found that plaintiff displayed mild restrictions in her activities of daily living; moderate limitations in social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 24-25). Plaintiff had not had episodes of decompensation of extended duration. Id.

statements regarding their intensity, persistence and limiting effect were "not entirely credible." (Tr. 27). The ALJ found that plaintiff retained the capacity to perform activities of daily living and "many basic activities associated with work." Id.

At step four, the ALJ concluded that plaintiff could not return to her past relevant work. (Tr. 29). Her age placed her in the "younger individual" category on the alleged onset date. She had limited education and was able to communicate in English. Id. The Medical-Vocational Guidelines thus supported a finding that she was not disabled. Based on the vocational expert's answers to hypothetical questions, the ALJ found at step five that someone with plaintiff's age, education, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a cleaner II, lab equipment cleaner, and marker II. (Tr. 30). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act. Id.

## V. Discussion

Plaintiff asserts three challenges to the ALJ's decision. She contends that the ALJ (1) failed to properly weigh the medical opinion evidence, with the result that the ALJ improperly determined her mental RFC; (2) improperly discounted her credibility; and (3) failed to include all relevant mental limitations in the hypothetical posed to the vocational expert.

### A. Opinion Evidence

Plaintiff argues that the ALJ erred by discounting the opinion of her treating psychiatrist, Dr. Yanamadala. A treating physician's opinion must be given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence."[13]  Papesh v. Colvin, 786 F.3d 1126, 1132 (8th

Cir. 2015) (quoting Wagner v. Astrue, 499 F.3d 842, 848–49 (8th Cir. 2007)).  "Not inconsistent

. . . is a term used to indicate that a well-supported treating source medical opinion need not be

supported directly by all of the other evidence (*i.e.*, it does not have to be consistent with all the

other evidence) as long as there is no other substantial evidence in the case record that

contradicts or conflicts with the opinion."  Id. (quoting S.S.R. 96–2p, Policy Interpretation

Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions,

1996 WL 374188 (July 2, 1996)).  "Even if the [treating physician's] opinion is not entitled to

controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."

Id. (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (alteration in original)).  The

treating physician's opinion may have "limited weight if it provides conclusory statements only,

or is inconsistent with the record."  Id. (citations omitted).  The ALJ "may discount or even

disregard the opinion . . . where other medical assessments are supported by better or more

thorough medical evidence, or where a treating physician renders inconsistent opinions that

undermine the credibility of such opinions."  Id. (quoting Miller v. Colvin, 784 F.3d 472, 477

(8th Cir. 2015)).  If a treating physician's opinion is not given controlling weight, however, the

ALJ must consider the following factors in determining what weight to give the opinion: (1) the

length of the treatment relationship and the frequency of examination; (2) the nature and extent

of the treatment relationship, including the treatment provided and the kind of examination or

---

[13]This continues to be true for plaintiff's claim because it was filed before March 27, 2017.  Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the Secretary's attention which tend to support or contradict the opinion. Constable v. Colvin, No. 4:14 CV 1128 CDP, 2015 WL 5734977, at *15 (E.D. Mo. Sept. 29, 2015); 20 C.F.R. § 404.1527(d)(2)–(6).

Based on five office visits with plaintiff, Dr. Yanamadala concluded on June 29, 2015, that plaintiff displayed "moderate to marked" to "marked" limitations in 23 categories of functioning, across the four domains of understanding and memory, concentration and persistence, social interactions, and adaptation. (Tr. 944). The ALJ rejected Dr. Yanamadala's assessment as inconsistent with his own treatment records and the records of other providers. In addition, the ALJ determined that Dr. Yanamadala's opinion was largely based on plaintiff's "non-credible subjective reports/responses . . . which are contrary to her reports elsewhere in the record" and her activities of daily living, which "indicate she is not only able to care for herself, but others as well." (Tr. 28).

Substantial evidence in the record supports the ALJ's assessment that Dr. Yanamadala's opinion is inconsistent with his own treatment records. For example, Dr. Yanamadala opined that plaintiff would have at least moderate difficulty adhering to basic standards of neatness while his treatment notes routinely described her as well-groomed. Similarly, while he opined that plaintiff had significant impairments in the understanding and memory domain, he stated in his notes that she displayed normal cognition and reasoning, with logical and goal-directed thoughts, and had intact recent and remote memory. And, at every visit, he described her "attention/ concentration" as "intact." Indeed, all of plaintiff's mental status examinations were

unremarkable, with the exception of her mood which was anxious, sad, dysthymic, or low. While these mood impairments support the ALJ's determination that plaintiff has serious impairments, this history of mood impairment alone does not support the severe impairments that Dr. Yanamadala endorsed. Dr. Yanamadala's opinion is also inconsistent with Dr. Rohatgi's notes from more than two years of treatment with plaintiff, in which she was regularly reported to be cooperative, with good eye contact, appropriate hygiene and grooming, and linear thought processes and normal thought content. From January 2013 until June 2014, Dr. Rohatgi assigned plaintiff Global Assessment of Functioning (GAF) scores of 55 to 60,[14] reflecting a moderate degree of impairment, in contrast with the score of 45[15] that Dr. Yanamadala assessed, reflecting a serious degree of impairment.[16] In addition, plaintiff's own reports of her activities and functioning demonstrate a higher degree of functioning than what is reflected in Dr. Yanamadala's opinion. For example, in January 2014, plaintiff reported that she was home-

---

[14] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairments in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000) (DSM-IV-TR). A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34.

[15] A GAF of 41-50 corresponds with "serious symptoms  (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

[16] The ALJ gave the GAF scores little weight, noting that the "GAF score is a non-standardized, subjective assessment that was never intended to be used in litigation." (Tr. 28). "[A]ccording to the [Diagnostic and Statistical Manual's] explanation of the [Global Assessment Functioning] scale, a score may have little or no bearing on the subject's social and occupational functioning. . .  [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [Global Assessment Functioning] score in the first place." Jones v. Astrue, 619 F.3d 963, 973 (8th Cir. 2010) (citations omitted) (alterations in original). Indeed, the Commissioner has declined to endorse the GAF score for use in the Social Security and SSI disability programs and has indicated that GAF scores "have no direct correlation to the severity requirements of the mental disorders listings." Nowling v. Colvin, 813 F.3d 1110, 1116 (8th Cir. 2016) (citations omitted).

schooling her daughter and, in February 2014, plaintiff was helping her mother care for her disabled father. (Tr. 766, 868, 876). In March 2014, she had gotten a car and was working. (Tr. 864). In April 2014, she identified "exciting things in her life," including a "more fulfilling relationship" with her daughter. (Tr. 861). In July 2014, plaintiff was working with her pastor to start a support group. (Tr. 834). In August 2014, plaintiff was employed, attending court dates, and successfully completing Comtrea's drug and alcohol dependence program. (Tr. 827).

Plaintiff argues that the ALJ improperly discounted Dr. Yanamadala's opinion as "overly reliant" on plaintiff's "non-credible" subjective complaints. As discussed below, the ALJ found that plaintiff's subjective complaints were not entirely credible. Accordingly, the ALJ was entitled to discount Dr. Yanamadala's opinions to the extent that they were based on plaintiff's subjective complaints.[17] Julin v. Colvin, 826 F.3d 1082, 1089 (8th Cir. 2016).

### B.  Credibility Determination

The ALJ determined that plaintiff's allegations of disabling symptoms were not entirely credible. (Tr. 26-28). The Eighth Circuit has instructed that the ALJ is to consider the credibility of a plaintiff's subjective complaints in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984); see also 20 C.F.R. §§ 404.1529. 416.929. The factors identified in Polaski include: a plaintiff's daily activities; the location, duration, frequency, and intensity of her symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of her medication; treatment and measures other than medication she has received; and any other factors concerning her impairment-related limitations. See Polaski, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529. 416.929. An ALJ is not, however, required to

---

[17] Based on the inconsistencies between Dr. Yanamadala's own treatment notes and his opinion, it was reasonable for the ALJ to conclude that he relied on plaintiff's subjective complaints in forming his opinion.

specifically discuss each Polaski factor and how it relates to a plaintiff's credibility. See Partee v. Astrue, 638 F.3d 860, 965 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every Polaski factor relates to the [plaintiff's] credibility.").

The Court reviews the ALJ's credibility determination with deference and may not substitute its own judgment for that of the ALJ. "The ALJ is in a better position to evaluate credibility, and therefore we defer to her determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." Andrews v. Colvin, 791 F.3d 923, 929 (8th Cir. 2015). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the courts] will normally defer to the ALJ's credibility determination. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (citation omitted).

As noted by the ALJ and discussed above, plaintiff's subjective complaints were inconsistent with the clinical findings from her mental status examinations. See Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (absence of objective medical evidence to support the complaints is a factor to be considered); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ also cited plaintiff's pattern of changing the dosages of her medications or stopping them altogether, despite evidence that her symptoms and functioning improved when she adhered to her treatment plan. (Tr. 27). Vance v. Berryhill, 860 F.3d 1114,

1121 (8th Cir. 2017) (plaintiff's failure to follow treatment recommendations weighs against credibility). The inconsistency between plaintiff's subjective complaints and evidence regarding her activities of daily living also raised legitimate concerns about her credibility. Id. As the ALJ noted, plaintiff performed various household tasks; attended multiple AA meetings, doctors' appointments, and group and individual counseling. She home-schooled her daughter; helped her mother care for her disabled father; and completed the treatment and community service components of her probation. In addition, plaintiff looked for and successfully found employment at various times. Plaintiff's credibility is further undermined by inconsistencies between her statements and other evidence in the record. As noted above, plaintiff had periods of employment that she did not include in her Function Report. In addition, while she told the ALJ that Dr. Rohatgi's treatment did not work, she consistently reported that her medications improved her mood, reduced her anxiety, and helped curb her cravings for alcohol. (Tr. 540, 547, 809, 815, 817, 821, 825).

The ALJ characterized plaintiff's treatment as "conservative and/or routine in nature." (Tr. 27). A history of conservative treatment is a valid basis for discounting a claimant's allegation of disabling symptoms. Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Plaintiff argues that the ALJ erred in characterizing her treatment with psychotropic medications as conservative, citing Baker v. Astrue, No. ED CV 09-01078 RZ, 2010 WL 682263, at *1 (C.D. Cal. Feb. 24, 2010) ("Much treatment of mental disorders involves medication management, and it is unpersuasive to call this 'conservative treatment,' and state that therefore a claimant does not have a severe impairment. Where mental activity is involved, administering medications that can alter behavior shows anything but conservative treatment."). The analysis in Baker applied standards set forth by the Ninth Circuit.

The courts in the Eighth Circuit have not applied a categorical rule that treatment with psychotropic medications cannot be deemed conservative or routine. See, e.g., Alie v. Berryhill, No. 4:16 CV 1353 JMB, 2017 WL 2572287, at *10 n.8 (E.D. Mo. June 14, 2017) (characterizing outpatient medication management and counseling as "routine"); Wise v. Astrue, No. 11-0864-CV-W-JCE-SSA, 2012 WL 3156763, at *6 (W.D. Mo. Aug. 2, 2012) (characterizing treatment of psychiatric conditions with medication and counseling as "fairly routine and conservative"); Brown v. Astrue, No. 4:10CV2300 FRB, 2012 WL 886879, at *14 (E.D. Mo. Mar. 15, 2012) (same).[18]

The ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from her credibility, as required by Polaski. The ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence and the Court defers to this determination.

C. **The Hypothetical Posed to the Vocational Expert**

The hypothetical posed to the vocational expert assumed an individual restricted to understanding, remembering, and carrying out simple tasks; making simple work-related decisions; having occasional interaction with supervisors, coworkers, and the public; and able to tolerate only occasional changes in the work location. (Tr. 67-68). Plaintiff contends that this

---

[18] The determination that plaintiff received conservative treatment for her psychiatric disorders is not contradicted by her record of emergency and impatient treatment for substance abuse. "[I]f alcohol or drug abuse is a 'contributing factor material to the Commissioner's determination' of a disability, the claimant is not entitled to benefits." Vester v. Barnhart, 416 F.3d 886, 888 (8th Cir. 2005) (quoting 42 U.S.C. § 423(d)(2)(C)). A disability claimant "has the burden of demonstrating that she would still be disabled if she were to stop using drugs or alcohol." Id. (citing 20 C.F.R. § 416.935(b)(1) and Pettit v. Apfel, 218 F.3d 901, 903 (8th Cir. 2000)).

hypothetical does not account for her moderate limitations in concentration, persistence, and pace as found by the ALJ concluded. (Tr. 25).

"A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant." Howard v. Massanari, 255 F.3d 577, 581–82 (8th Cir. 2001) (quoting Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996)). Testimony from a vocational expert based on a properly-phrased hypothetical constitutes substantial evidence. Id. While the hypothetical question must set forth all the claimant's impairments, it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments. Roe v. Chater, 92 F.3d 672, 676 (8th Cir. 1996) (citation omitted).

In Howard, the claimant argued that the ALJ did not adequately present his deficiencies in concentration, persistence, or pace in the hypotheticals to the vocational expert. Howard, 255 F.3d at 581. The hypothetical asked the vocational expert to assume that the individual would be capable of "simple, routine, repetitive tasks." Id. The state agency psychological consultant opined that Howard was "able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function." Id. Based on this evidence, the Eighth Circuit held that the ALJ's hypothetical adequately captured the claimant's deficiencies in concentration, persistence, or pace. Id. Here, as in Howard, the state agency consultant found that plaintiff had moderate difficulties in maintaining concentration, persistence or pace, but was still capable of performing simple, repetitive tasks. (Tr. 105, 108). And here, as in Howard, ALJ asked the vocational expert to assume that plaintiff was limited to simple tasks and making simple decisions. The Court finds that the limitations

posed in the hypothetical are consistent with moderate difficulties regarding concentration, persistence, or pace.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.  A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of February, 2018.